No. 22-50024

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MICHAEL JOSEPH PEPE,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dale S. Fischer, Presiding
No. CR-07-00168-DSF

# Appellant's Opening Brief

CUAUHTEMOC ORTEGA
Federal Public Defender
JAMES H. LOCKLIN
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California  90012
213-894-2929

*Counsel for Defendant-Appellant*

# Table of Contents

Table of Authorities ................................................................ vii

Introduction ........................................................................... 1

Issues Presented ..................................................................... 3

Statement re Addendum ........................................................... 3

Statement of Jurisdiction ......................................................... 3

Custody Status of Appellant ..................................................... 4

Statement of the Case .............................................................. 4

    1.  Several women testified that Michael Pepe engaged in sex acts with them at his Cambodian home when they were minors. ........................... 5

    2.  In 2003, Pepe moved to Cambodia and established a residence there. ........... 6

    3.  In May 2005, Pepe took an innocent round trip to the United States to attend his son's graduation. ........................... 15

    4.  The first alleged sex acts with minors did not occur until weeks after Pepe returned home to Cambodia. ........................... 16

    5.  In August-September 2005, Pepe took another innocent round trip to the United States to attend his daughter's wedding. ........................... 19

6. Two months after Pepe returned home to Cambodia, he allegedly engaged in more sex acts with different girls. .................................................20

Summary of Argument ...........................................................................22

Standards of Review ...............................................................................25

Argument...................................................................................................26

1. The Court should reverse Michael Pepe's convictions and direct entry of a judgment of acquittal. .................................................................26

A. Trial evidence is insufficient to support a conviction if no rational juror could have found that the government proved each element of the offense beyond a reasonable doubt—in other words, if the juror could not have reached a subjective state of near certitude that Pepe is guilty...................................................................................................26

B. Because all the alleged sex acts occurred at Pepe's Cambodian home, precedent precludes finding that the return legs of his innocent round trips to the United States were made for the purpose of engaging in the sex acts.................................................................................................30

1) Stare decisis requires this Court to follow Supreme Court and circuit precedent. .................................................................31

2) The Supreme Court established the innocent-round-trip doctrine in *Mortensen v. United States* and applied it in subsequent cases. .........33

3) This Court applied *Mortensen*'s innocent-round-trip doctrine. ..........38

4) This precedent compels the conclusion that the evidence is insufficient to support Pepe's convictions. .........................................42

C. Even if the Court could ignore the innocent-round-trip precedent, the evidence was insufficient to prove the mens rea elements. .....................45

1) No rational juror could have found beyond a reasonable doubt that sex acts were a dominant, significant, or motivating—but not merely incidental—purpose of Pepe's return trips home....................46

2) The government presented no evidence that Pepe engaged in any child-sex acts, or even expressed a desire to do so, until weeks after his May 2005 trip, so no rational juror could have found beyond a reasonable doubt that he intended to engage in such acts as he traveled back to Cambodia for purposes of Counts 1 and 3. .....49

3) Because the government failed to prove that Pepe engaged in any additional child-sex acts until two months after his September 2005 trip, no rational juror could have found beyond a reasonable doubt that such sex acts were anything more than merely incidental to his travel back to Cambodia for purposes of Counts 2 and 4. ........50

4) Even if Pepe traveled for the purpose of engaging in sex acts with minors, a rational juror could not have found beyond a reasonable doubt that he traveled with the specific intent to engage in such acts with girls *under 12* for purposes of Counts 3 and 4, let alone that any of the alleged victims were actually that age. ......................51

2. At a minimum, the Court should reverse all of Pepe's convictions and remand for a new trial......................................................................60

A. The district court erred in not giving a defense-theory jury instruction based on *Mortensen*...................................................................60

B. The district court erred in defining the mens rea elements for the jury...62

Conclusion ...........................................................................................70

Certificate of Related Cases....................................................................71

Certificate of Compliance for Brief .........................................................72

v

Addendum .................................................................................................73

# Table of Authorities

## **Cases**

*Becker v. United States*,
217 F.2d 555 (8th Cir. 1954), *reversed*, 348 U.S. 957 (1955) ...................... 38, 42

*Bosse v. Oklahoma*,
137 S. Ct. 1 (2016) ......................................................................................32

*Bradley v. Duncan*,
315 F.3d 1091 (9th Cir. 2002) .....................................................................61

*Burks v. United States*,
437 U.S. 1 (1978) .........................................................................................29

*Cleveland v. United States*,
329 U.S. 14 (1946) .......................................................................................63

*Fisher v. United States*,
266 F. 667 (4th Cir. 1920) ............................................................................40

*Hansen v. Haff*,
291 U.S. 559 (1934) ............................................................................... 36, 37

*Hart v. Massanari*,
266 F.3d 1155 (9th Cir. 2001) ................................................................ 32, 33

*Hawkins v. United States*,
358 U.S. 74 (1958) .......................................................................................63

*Hubbard v. United States*,
514 U.S. 695 (1995) .....................................................................................32

*Hunter v. United States*,
45 F.2d 55 (4th Cir. 1930) ............................................................................42

*Hutto v. Davis*,
454 U.S. 370 (1982) .....................................................................................32

*In re Winship*,
    397 U.S. 358 (1970) ....................................................................... 26, 27

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ....................................................................... 27, 28

*Kimble v. Marvel Entertainment, LLC*,
    576 U.S. 446 (2015) ............................................................................31

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .......................................................................31

*Langere v. Verizon Wireless Services, LLC*,
    983 F.3d 1115 (9th Cir. 2020) ...........................................................33

*Langford v. United States*,
    178 F.2d 48 (9th Cir. 1949)......................................................... passim

*Maquiz v. Hedgpeth*,
    907 F.3d 1212 (9th Cir. 2018) ...........................................................28

*Mortensen v. United States*,
    322 U.S. 369 (1944) ................................................................... passim

*Musacchio v. United States*,
    577 U.S. 237 (2016) ............................................................................46

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020) .................................................................. 31, 32

*Sealed Appellee v. Sealed Appellant*,
    825 F.3d 247 (5th Cir. 2016)........................................................ 30, 34

*Smart v. United States*,
    202 F.2d 874 (5th Cir. 1953)..............................................................42

*Twitchell v. United States*,
    330 F.2d 759 (9th Cir. 1964)....................................................... 41, 42

*United States v. Bibbero*,
    749 F.2d 581 (9th Cir. 1984)..............................................................30

*United States v. Cortes*,
    757 F.3d 850 (9th Cir. 2014)................................................................60

*United States v. Cox*,
    963 F.3d 915 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1281 (2021)....................29

*United States v. Duffin*,
    844 F.3d 786 (8th Cir. 2016)................................................................66

*United States v. Flucas*,
    22 F.4th 1149 (9th Cir. 2022) ..................................................... passim

*United States v. Garcia-Lopez*,
    234 F.3d 217 (5th Cir. 2000)......................................................... 34, 66

*United States v. Hall*,
    965 F.3d 1281 (11th Cir. 2020) ...........................................................29

*United States v. Hon*,
    306 F.2d 52 (7th Cir. 1962)................................................................42

*United States v. Jackson*,
    24 F.4th 1308 (9th Cir. 2022) .............................................................25

*United States v. LeMay*,
    260 F.3d 1018 (9th Cir. 2001) ............................................................29

*United States v. Lukashov*,
    694 F.3d 1107 (9th Cir. 2012) ............................................................65

*United States v. McGuire*,
    627 F.3d 622 (7th Cir. 2010)......................................................... 66, 69

*United States v. Mendoza*,
    25 F.4th 730 (9th Cir. 2022) ..............................................................28

*United States v. Murphy*,
    942 F.3d 73 (2d Cir. 2019)................................................................30

*United States v. Navarrete-Aguilar*,
    813 F.3d 785 (9th Cir. 2015)..............................................................28

*United States v. Navrestad*,
  66 M.J. 262 (C.A.A.F. 2008) .................................................................29

*United States v. Nevils*,
  598 F.3d 1158 (9th Cir. 2010) ............................................................28

*United States v. Nobari*,
  574 F.3d 1065 (9th Cir. 2009) ............................................................29

*United States v. Ocampo-Estrada*,
  873 F.3d 661 (9th Cir. 2017)..............................................................60

*United States v. Oriolo*,
  146 F.2d 152 (3d Cir. 1944), *reversed*, 324 U.S. 824 (1945)................ 37, 40, 42

*United States v. Pepe*,
  895 F.3d 679 (9th Cir. 2018)...........................................................1, 64

*United States v. Perkins*,
  948 F.3d 936 (8th Cir. 2020)......................................................... 30, 66

*United States v. Ross*,
  257 F.2d 292 (2d Cir. 1958)...............................................................42

*United States v. Schneider*,
  801 F.3d 186 (3d Cir. 2015).................................................................34

*United States v. Vang*,
  128 F.3d 1065 (7th Cir. 1997) ...........................................................34

*United States v. Velazquez*,
  1 F.4th 1132 (9th Cir. 2021) ...............................................................27

*Van Pelt v. United States*,
  240 F. 346 (4th Cir. 1917)...................................................................40

*Vasquez v. Hillery*,
  474 U.S. 254 (1986) ...........................................................................31

x

## U.S. Constitution

U.S. Const., Amend. V ........................................................................ 26, 29

## Statutes

18 U.S.C. § 2241 (2005) ............................................................. 2, 3, 5, 30

18 U.S.C. § 2423 (2005) ................................................................. passim

18 U.S.C. § 3231 ................................................................................... 3

28 U.S.C. § 1291 ................................................................................... 4

## Rules

Fed. R. App. P. 25 ............................................................................... 18

Fed. R. App. P. 4 ................................................................................... 4

Fed. R. Crim. P. 49.1 ......................................................................... 18

Fed. R. Evid. 403 ............................................................................... 29

## Other Authorities

*Mortensen v. United States*, Brief for the United States,
   1944 WL 42874 (Mar. 1944) ............................................................ 44

New Oxford American Dictionary (3d ed. 2010) ........................... 67, 69

# Introduction

Michael Pepe, a U.S. citizen, lived in Cambodia when he allegedly had sex with minors there in 2005-2006. The *current* version of 18 U.S.C. § 2423(c) purportedly reaches citizens who engage in prohibited sexual activity while residing in a foreign country, but this Court reversed Pepe's convictions under a *prior* version of that provision, finding it inapplicable to citizens living abroad unless they were still traveling in foreign commerce when the activities occurred. *United States v. Pepe*, 895 F.3d 679, 682, 686-92 (9th Cir. 2018).[1] "If, as Pepe maintains, he relocated to Cambodia in March 2003, then the statute does not apply to him." *Id*. at 691. The Court therefore held that "should the government elect to retry him, it will need to prove that he was still traveling when he committed illicit sexual conduct." *Id*. at 692.

Implicitly recognizing that it could not meet that burden, the government abandoned the § 2423(c) counts on remand and instead charged Pepe with four different crimes—two counts alleging that he traveled in foreign commerce for the purpose of engaging in illicit sexual conduct in violation of 18 U.S.C. § 2423(b) (2005), and two counts alleging that he crossed a state line with the intent to

---

[1]    2-ER-39–69 (opinion).

1

engage in sex with a person under 12 in violation of 18 U.S.C. § 2241(c) (2005).[2]

Each count was based on the return legs of Pepe's brief round trips to the United

States to attend family functions in 2005.[3]  The government's theory was that Pepe

returned to his Cambodian home each time for the purpose of engaging in

prohibited sex acts because it "was his own personal brothel."[4]  But in *Mortensen*

*v. United States*, the Supreme Court reversed Mann Act convictions for insufficient

evidence where the defendants ran an *actual* brothel and took two of their

prostitutes on an innocent round trip for vacation.  322 U.S. 369 (1944).[5]  Even

though all understood that the women would resume their sex work at the end of

the trip, the trip itself was a break in the operation of the brothel, and the round trip

couldn't be split into two parts as to permit an inference that the interstate travel

home was for that illegal purpose.  *Id.* at 374-77.  Likewise, Pepe's innocent round

trips to the United States were breaks from whatever happened in Cambodia, so he

could not possibly have had the requisite intent when leaving the United States to

return home.

---

[2]  2-ER-75–80.

[3]  *Infra* Statement of the Case, Parts 3 & 5.

[4]  4-ER-766.

[5]  *Infra* Argument, Part 1.B.2.

In short, the government, desperate to manufacture American crimes based on conduct occurring entirely in Cambodia, once again charged Pepe with violating inapplicable statutes.  As before, the Court should reverse his convictions.

# Issues Presented

1. Should the Court reverse Pepe's convictions for insufficient evidence and direct entry of a judgment of acquittal?

2. Should the Court reverse Pepe's convictions for jury-instruction errors and remand for a new trial?

# Statement re Addendum

Pertinent authority is in an attached addendum.

# Statement of Jurisdiction

A jury found Michael Pepe guilty of violating 18 U.S.C. § 2423(b) (2005) and 18 U.S.C. § 2241(c) (2005).[6]  The district court, the Honorable Dale S. Fischer, Judge, presiding, had jurisdiction over this case under 18 U.S.C. § 3231.

---

[6]  2-ER-75–80; 5-ER-859–62, 964–69.

3

The district court entered its original judgment on February 14, 2022, its order denying Pepe's judgment-of-acquittal motion on February 15, its restitution order on April 18, and its amended judgment on April 20.[7]  Pepe filed timely notices of appeal as to each of these things.[8]  *See* Fed. R. App. P. 4(b).

This Court has jurisdiction to hear this appeal from the final decisions of a district court under 28 U.S.C. § 1291.

# Custody Status of Appellant

Michael Pepe is serving his 210-year sentence.[9]

# Statement of the Case

A jury found Michael Pepe guilty on four counts.[10]  Counts 1 and 2 alleged that he traveled in foreign commerce for the purpose of engaging in illicit sexual conduct in violation of 18 U.S.C. § 2423(b) (2005).[11]  Counts 3 and 4 alleged that he crossed a state line with the intent to engage in a sexual act with a person under

---

[7]  1-ER-17–31; 7-ER-1323–29, 1333–47, 1411–14.

[8]  7-ER-1330–32, 1348–49.

[9]  1-ER-24.

[10]  5-ER-859–62, 964–69.

[11]  2-ER-75–77.

12 in violation of 18 U.S.C. § 2241(c) (2005).[12]  Counts 1 and 3 were based on the return leg of Pepe's brief round trip to the United States to attend his son's graduation in May 2005; Counts 2 and 4 were based on the return leg of his brief round trip to the United States to attend his daughter's wedding in August-September 2005.[13]

## 1. Several women testified that Michael Pepe engaged in sex acts with them at his Cambodian home when they were minors.

At Pepe's trial, several women (K.S., S.S., S.R., I.T., L.K., T.C., N.P. and N.T.D.)[14] testified that he engaged in sex acts with them in Cambodia when they were girls.[15]  Another woman called Basang testified that she procured girls for

------

[12]  2-ER-78–80.

[13]  *Infra* Parts 3 & 5.  For Counts 3 and 4, the government's primary theory was that the international border between California and the Pacific Ocean was the "state line" crossed on Pepe's flight home, but it alternatively argued that he also crossed California's eastern state line when entering the state on his way out of the country.  4-ER-792, 797.

[14]  *See* 8-ER-1417–18 (noting names associated with initials).

[15]  2-ER-222–78, 298–312; 3-ER-321–49, 365–402, 412–60, 500–05.

Pepe in Cambodia.[16]  For purposes of this appeal, Pepe assumes (but does not concede) that the testimony about the sex acts is true.[17]

## 2. In 2003, Pepe moved to Cambodia and established a residence there.

Pepe was born in Massachusetts in 1953.[18]  He grew up in California with his four siblings.[19]  Straight out of high school, Pepe joined the United States Marine Corps in 1971 and was stationed in Asia for some time.[20]  After about 20 years of military service and obtaining the rank of captain, he retired.[21]  During that period, Pepe married a few times and had three children.[22]  After retiring from the Marines, Pepe worked multiple jobs (including as a community-college teacher)

---

[16]  9-ER-1621–716.

[17]  References to such acts in this brief are made with that assumption in mind, even when qualifiers like "allegedly" or "purportedly" aren't used.

[18]  2-ER-177.

[19]  2-ER-279.

[20]  4-ER-590, 628, 677.

[21]  4-ER-590, 628, 667, 677; 9-ER-1586.

[22]  2-ER-280; 4-ER-665–66, 675–76.

but struggled financially.[23]  In March 2003, he moved to Phnom Penh, Cambodia.[24] The trial evidence established his intent to live there long term, if not permanently.

A. *Notices*.  Soon after arriving in Cambodia, Pepe registered with the U.S. embassy there, declaring that his expected date of departure was "unknown."[25]  He also informed the Department of Veteran's Affairs that he had moved to Cambodia.[26]

B. *Home*.  In stark contrast to his modest lifestyle in the United States, Pepe could live well on relatively-little money in Cambodia.[27]  For example, in May 2004, he began renting a large house for $800 per month, entering into a year-long

---

[23]  4-ER-590–91, 628, 666, 676–78, 684–85.

[24]  2-ER-284, 296; 4-ER-591, 628–29, 667–68; 6-ER-1065; 9-ER-1572–73.

[25]  6-ER-1065–66; 9-ER-1573–74.

[26]  6-ER-1077–78; 9-ER-1574–75.

[27]  2-ER-285, 297; 4-ER-594, 668–69, 677–78.

lease agreement.[28]  He extended that lease in May 2005 and again in May 2006.[29]

In addition to securing this residence, Pepe made other arrangements reflecting his intent to make Cambodia his long-term home: he obtained a Cambodian driver's license;[30] he purchased vehicles there;[31] he opened an account at a local bank;[32] he

---

[28]  3-ER-468–73; *see generally* D-Ex. 714.  In this brief, "see generally" citations refer to government exhibits (G-Ex.) and defense exhibits (D-Ex.) that aren't in the excerpts of record.  *See* 5-ER-907–61 (list of admitted exhibits).  The fact that these photos and records exist and support the trial testimony is relevant, but actually reviewing these exhibits would not meaningfully advance the Court's review given that the matters are uncontested.  I can, however, provide supplemental volumes of the excerpts of record with these voluminous exhibits at the Court's request.

[29]  3-ER-473–75; *see generally* D-Ex. 715-716.

[30]  4-ER-594.

[31]  4-ER-594; 9-ER-1531, 1582–84; *see generally* D-Ex. 751-753, 755-756.  In contrast, Pepe gave away his American car when he moved to Cambodia.  4-ER-667–68.

[32]  4-ER-594–95, 685; 9-ER-1577–80; *see generally* D-Ex. 743.

8

got a Cambodian cellphone;[33] he rented a post office box in Phnom Penh;[34] and he saw a local physician.[35]

C. *Employment*.  Pepe started teaching management courses to adult students at Pannasastra University as soon as he arrived in Phnom Penh in March 2003.[36] From then until June 2005, he taught two to five classes per term.[37]  When he took the May 2005 trip discussed below,[38] Pepe informed the university that he would be gone for a week but would hold make-up classes on May 28.[39]  He later told the university that he planned to take the next term off because of the August-September trip discussed below,[40] but he planned to resume teaching when he

---

[33]  9-ER-1580–81; *see generally* D-Ex. 724-739.

[34]  9-ER-1581–82; *see generally* D-Ex. 741-742.

[35]  9-ER-1584; *see generally* D-Ex. 824.  In contrast, Pepe was no longer in contact with his California doctors.  6-ER-1079.

[36]  3-ER-351–53; 4-ER-598; 5-ER-988–96.

[37]  3-ER-353–61; 4-ER-597–98; 5-ER-989–90, 997–98; *see generally* D-Ex. 703-709, 834-835.

[38]  *Infra* Part 3.

[39]  6-ER-1081.

[40]  *Infra* Part 5.

returned.[41]  Although he never did so,[42] in August 2005, Pepe expressed his desire

to "have a long and fruitful association" with the university after some time

working on other projects.[43]

D. *Relationship*.  Pepe entered into a long-term relationship with a Cambodian

woman named Chanry Bith (also known as Nary).[44]  They had been together for

about a year when Pepe's sister Elaine and brother-in-law Richard visited for a few

weeks in July 2004.[45]  Richard (a former law-enforcement officer) described the

couple as "very emotionally close."[46]  Elaine similarly observed that they "loved

each other[,]" "took care of each other and helped each other and did things for

each other."[47]

Pepe and Chanry married in March 2005.[48]  They entered into a kind of

prenuptial agreement that noted that there would be no exchange of property and

---

[41]  3-ER-354–55, 362.

[42]  3-ER-355; 5-ER-998–99.

[43]  6-ER-1069.

[44]  4-ER-592, 630–31; 9-ER-1589.

[45]  4-ER-592–97, 621, 629–31.

[46]  4-ER-589, 595–96.

[47]  4-ER-631.

[48]  4-ER-602–03, 632–33, 669, 679; 9-ER-1541–42; *see generally* G-Ex. 3059; D-Ex. 758, 761, 771.

that the marriage would satisfy Chanry's family.[49]  Still, as his brother-in-law noted, Pepe "was overjoyed about being married."[50]  Pepe's daughter also described him as "in love" and "happy" about the wedding.[51]  At one point, Pepe sent a letter to his family with his wishes if he were to die in Cambodia, which included that Chanry be taken care of financially.[52]

As with many relationships, Pepe and his wife had their ups and downs.[53]  For example, in May 2005, Pepe wrote a letter to Chanry suggesting that they could not "be together" despite how much he loved her.[54]  Nevertheless, before Pepe visited the United States for his daughter's wedding three months later,[55] they applied for a two-week tourist visa so Chanry could go with him.[56]  When that was denied,[57] Pepe went alone, but soon after he left, he sent an email to his "Dearest

---

[49]  2-ER-182; 6-ER-1153–56; 9-ER-1541–42.

[50]  4-ER-615.

[51]  4-ER-679–80.

[52]  4-ER-619–20; 6-ER-1073–74.

[53]  2-ER-182; 6-ER-1153–56; 9-ER-1543–46; *see generally* G-Ex. 117, 118, 125-128.

[54]  4-ER-577; 6-ER-1203.

[55]  *Infra* Part 6.

[56]  6-ER-1070–71.

[57]  6-ER-1072.

Nary" to send his "love" and to let her know that he missed her and was "[l]ooking forward to giving [her] a hug and kiss soon."[58] The couple also talked frequently by phone during such trips.[59]

At some point, Chanry moved out of the house, but it's unclear when.[60] Even when Pepe was arrested in June 2006, however, pictures of him and Chanry together hung on the walls of his home.[61] She helped make arrangements for Pepe to get food and other necessities while in a Cambodian prison thereafter.[62] And when he was later sent to the United States for prosecution, Pepe was concerned about Chanry's well-being and asked his family to send her money.[63] She also continued to support him, even attending part of his first trial in 2008.[64]

E. *Community Involvement*. Pepe joined the Phnom Penh chapter of the Veterans of Foreign Wars and participated in community-service programs with

---

[58] 6-ER-1197; 9-ER-1545.

[59] 4-ER-618.

[60] 9-ER-1634–35.

[61] 3-ER-481; *see generally* D-Ex. 768-769.

[62] 2-ER-295.

[63] 4-ER-640–41.

[64] 3-ER-480; 4-ER-638–40.

that organization.[65]  He attended at least one diplomatic event at the U.S.

embassy,[66] as well as Cambodian political ceremonies.[67]  In fact, with the support

of a prominent Cambodian politician, Pepe spent a considerable amount of time in

2005-2006 developing a long-term executive training program for adults in the

business community.[68]  That politician and others also supported a separate

program (the Socrates Foundation) implemented by Pepe to provide supplies to

rural-school students on numerous occasions from August 2004 through (at least)

August 2005.[69]  That month, three different Cambodian politicians signed letters

---

[65]  2-ER-285; 4-ER-598–99; 6-ER-1086–90; 9-ER-1586; *see generally* D-Ex. 804-
807.

[66]  9-ER-1511–12; *see generally* G-Ex. 76.

[67]  9-ER-1512–13; *see generally* G-Ex. 1195.

[68]  4-ER-656–61; 6-ER-1063–64, 1075–76; *see generally* D-Ex. 795-796, 843.

[69]  3-ER-476–79; 4-ER-600, 633, 661–63; 6-ER-1091–95; 9-ER-1585; *see
generally* D-Ex. 810, 814-815, 829-830, 874.  Pepe's sister Elaine, her husband,
and Pepe's daughter testified that his charitable work in Cambodia was in
accordance with the kind of charitable work he had done in the United States.  4-
ER-601, 633–34, 676.  Pepe's sister Maureen, who "told him that he should try to
teach democracy in our own country, not over there," claimed that he didn't have a
charitable nature.  2-ER-286–87.  By the time of trial, however, Maureen (who
testified for the government) was estranged from both Pepe and Elaine.  4-ER-
618–19, 634–37, 641, 647–48.

13

praising the work the foundation had done.[70]  Pepe was also involved with another charity called the Sustainable Village Program in 2005-2006.[71]

F.  *Long-Term Residency*.  Consistent with Pepe putting down these roots in Cambodia, his sister Elaine believed that he "intended to be living there permanently."[72]  Her husband similarly noted that Pepe never expressed an intent to return to the United States and treated Cambodia as his home.[73]  Pepe's son also understood that his father "was moving out there to live" and "was going to stay out there for a long time."[74]  Pepe's daughter reached the same conclusion based on her interactions with him.[75]

After Pepe moved to Cambodia in early 2003, he visited the United States only briefly to attend family events.[76]  For example, when his granddaughter was born

---

[70]  6-ER-1060–62, 1080.

[71]  9-ER-1586; *see generally* D-Ex. 816-817.

[72]  4-ER-637–38.

[73]  4-ER-620.

[74]  4-ER-673.

[75]  4-ER-683–84.  Pepe's estranged sister Maureen didn't think he would have stayed in Cambodia permanently, but she didn't dispute that he was staying there indefinitely.  2-ER-297.

[76]  2-ER-296; 4-ER-617, 670, 680.

later in 2003, he flew here for a few days and returned home to Cambodia.[77]  Then, in 2004, Pepe briefly visited again for his daughter Elizabeth's graduation and once more returned to his Phnom Penh home.[78]  The charges in this case are based on two similar trips he took in 2005.[79]

### 3. In May 2005, Pepe took an innocent round trip to the United States to attend his son's graduation.

On May 16, Pepe flew from Phnom Penh to Los Angeles.[80]  The purpose of that trip was to attend the high-school graduation of his son Jason in New Mexico.[81] After that, he spent some time visiting with his father and two of his sisters (and their husbands) in California.[82]  On May 25, Pepe flew from Los Angeles back to Phnom Penh.[83]

---

[77]  4-ER-680.

[78]  4-ER-680–82; *see generally* Ex. 875.

[79]  *Infra* Parts 3 & 5.

[80]  2-ER-178.

[81]  2-ER-280–82; 4-ER-670–71, 682; *see generally* G-Ex. 131-132; D-Ex. 773. During this trip, Pepe invited his son to live with him in Cambodia.  4-ER-671–72.

[82]  2-ER-283–85, 296; 4-ER-617–18; *see generally* G-Ex. 133-135.

[83]  2-ER-178.

Pepe booked the flights from and back to Cambodia as a round trip.[84]  No Cambodian girls accompanied him on this trip, nor did the government present any other evidence of wrongdoing by Pepe during this trip.

## 4. The first alleged sex acts with minors did not occur until weeks after Pepe returned home to Cambodia.

The government presented no evidence that Pepe engaged in sex acts with minors before his May 2005 trip to the United States.  Basang testified that she first met Pepe at a Phnom Penh bar, where she worked as an adult prostitute, and she started having sex with him for money, but she did not say when that began.[85] More important, she did not specify when thereafter she purportedly started procuring underage girls for him.[86]

---

[84]  2-ER-179.

[85]  9-ER-1630–31.

[86]  9-ER-1628–716.

On June 4, Pepe hosted a party for his university students at his home.[87] Although Basang attended,[88] there's no evidence that any child was at the home (or that Pepe abused children elsewhere, for that matter) until a week later.

N.P. testified that Basang, her aunt, took her to Pepe's house, but she couldn't recall when that happened.[89]  Photos were taken of her there from June 9 through 22.[90]

---

[87]  4-ER-582, 586–87; 6-ER-1097 (referring to D-Ex. 821-A–B).  Class photos with Pepe were taken at the school a few days later.  4-ER-582–83; 6-ER-1097 (referring to D-Ex. 822).

[88]  4-ER-586–87; 10-ER-1765 (referring to G-Ex. 136-137, 357-359, 3017).

[89]  3-ER-502–03.

[90]  3-ER-553–54; 10-ER-1754.  The government's forensic computer expert explained summary charts of photos found on Pepe's digital media (G-Ex. 266, 267, 335, and D-Ex. 869), noting that the actual date of each photo was approximately 185 days after the "camera date" reflected in the photo's metadata. 3-ER-528–57; 4-ER-578–83; 6-ER-1096–97; 10-ER-1753–65.  One of the charts (G-Ex. 266) identified the earliest and latest photos found for each girl.  3-ER-553; 10-ER-1753–61.  For purposes of this appeal, Pepe assumes those modified dates are accurate, at least within a day or two.

17

N.P. was still there when Basang took K.S., another niece, to Pepe's house.[91] K.S. could not say when that happened,[92] but photos show her there on August 6.[93]

This limited evidence hardly proves that illicit sex was all Pepe was doing during these months, or even that it was his primary activity. On the contrary, the evidence established that he engaged in a variety of activities completely unrelated to sex. For example, photos show that he attended a Cambodian ceremony on June 25, went to a party on July 2, and traveled on August 6.[94] He also worked on his executive training program, writing letters on June 27 and August 16 and apparently holding a meeting on August 18.[95] In August, Pepe prepared a Socrates Foundation document that reflected (among other things) distributions of supplies in June, July, and August.[96] Pepe also prepared VFW program reports in August.[97]

---

[91] 3-ER-370–71, 502.

[92] 3-ER-367–71. In accordance with Fed. R. App. P. 25(a)(5) and Fed. R. Crim. P. 49.1(a), full birthdates are not included in this brief.

[93] 3-ER-554–55; 10-ER-1755.

[94] 4-ER-583; 6-ER-1097 (referring to D-Ex. 828, 831-A–B).

[95] 6-ER-1063–64, 1075–76.

[96] 6-ER-1091–95, 1098–100, 1103.

[97] 6-ER-1126–31.

In addition, he produced a "Traffic Management Proposal (Talking Paper)" in August.[98]

## 5. In August-September 2005, Pepe took another innocent round trip to the United States to attend his daughter's wedding.

On August 25, Pepe flew from Phnom Penh to Los Angeles.[99] The purpose of that trip was to attend the wedding of his daughter Andrea in New Mexico.[100] As before, he also spent some time visiting with his family in California.[101] On September 1, he flew from Los Angeles back to Phnom Penh.[102]

As before, Pepe booked the flights from and back to Cambodia as a round trip.[103] Once again, no Cambodian girls accompanied him on that trip, nor did the government present any other evidence of wrongdoing by Pepe during the trip.

---

[98]  6-ER-1083–85.

[99]  2-ER-178–79.

[100]  2-ER-282–83; 4-ER-672–73, 682–83; *see generally* G-Ex. 149; D-Ex. 777-A.

[101]  2-ER-284–85, 296; 4-ER-617–18; *see generally* G-Ex. 150; D-Ex. 777-B.

[102]  2-ER-179.

[103]  2-ER-179.

## 6. Two months after Pepe returned home to Cambodia, he allegedly engaged in more sex acts with different girls.

Witnesses testified that Pepe sexually abused them after he returned from his trip on September 3, but the earliest such activity did not happen until two months later. In the meantime, Pepe continued to engage in normal activities, like traveling with Chanry to visit her family in October,[104] and preparing more VFW reports that month (and more afterwards).[105]

L.K. said she started living at Pepe's house in late October or early November, and she was there for Christmas.[106] Photos of her were taken there from November 8 through June 11, 2006.[107]

S.R. and S.S. (sisters) couldn't recall when they went to Pepe's house, but they were also there by Christmas.[108] Photos show S.R. at Pepe's home from November 26 through June 11,[109] and show S.S. there from December 4 through June 11.[110]

---

[104] 4-ER-581–82, 615; 6-ER-1097 (referring to D-Ex. 757).

[105] 6-ER-1132–51.

[106] 2-ER-303–04, 310.

[107] 10-ER-1756.

[108] 2-ER-248, 277–78; 3-ER-432–33.

[109] 10-ER-1757.

[110] 10-ER-1758.

T.C. testified that she was at Pepe's house for about a month around Valentine's Day.[111]  Photos of her were taken there from February 14 through 28, 2006.[112]

N.T.D. said she was at Pepe's house for about a week around the Vietnamese lunar new year, which is celebrated in April.[113]  Photos of her were taken there on April 17, 2006.[114]

I.T. did not recall when she went to Pepe's house or how long she stayed.[115] S.S., L.K., and S.R. were already there when she arrived.[116]  Photos of her at Pepe's home were taken from April 21 through May 20, 2006.[117]

The government introduced a series of emails purportedly between Pepe and a man named Mack discussing children, but they were all from late March through early June 2006—more than six months after Pepe returned from his last innocent round trip to the United States.[118]

---

[111] 3-ER-388–89.

[112] 10-ER-1759.

[113] 2-ER-152; 3-ER-416.

[114] 10-ER-1760.

[115] 3-ER-447.

[116] 3-ER-448–49.

[117] 10-ER-1761.

[118] 4-ER-570–75; 6-ER-1201 (summary chart referring to G-Ex. 250-251, 253, 255).

21

Cambodian police (accompanied by American agents) arrested Pepe in June 2006.[119]  He then spent several months in a Cambodian prison before being sent to the United States to be prosecuted in this case.[120]  Pepe's sister Maureen testified about a letter he supposedly sent from the Cambodian prison in August 2006, but even if the statements therein are taken at face value, they refer only to conduct that occurred some significant period of time after Chanry moved out of his house in September or October 2005—thus, after he last returned from the United States.[121]  And although papers with apparent child-sex terms were purportedly found during the June 2006 search of Pepe's home (nine months after his trip), the record does not establish when those words were written.[122]

# Summary of Argument

Michael Pepe lived in Cambodia.  In an effort to Americanize crimes purportedly committed in that country, the government contended that when Pepe returned to Cambodia after twice traveling to the United States to attend family

---

[119] 3-ER-560; 9-ER-1450–51.

[120] 9-ER-1563.

[121] 9-ER-288–94; 10-ER-1728–52.

[122] 9-ER-1516–20; *see generally* G-Ex. 101, 130, 248-249.

functions, he crossed state lines and traveled in foreign commerce with the intent to engage in sex with minors once home. The Court should reverse Pepe's four convictions for those alleged crimes.

Longstanding precedent establishes that a travel-with-intent conviction cannot be based on the return leg of an innocent round trip, even if illegal sex acts occurred at the starting point before the trip and were expected to resume there afterwards. That's the situation presented here. Each time Pepe visited the United States, he booked his flights from and back to Cambodia as a round trip. No Cambodian girls traveled with him, and there was no evidence of any wrongdoing during these trips. Therefore, regardless of whether Pepe engaged in the alleged sex acts in Cambodia, the evidence is insufficient to support his convictions.

Even if the Court could ignore the innocent-round-trip precedent and consider the return trips to Cambodia in isolation, the evidence is still insufficient for multiple reasons. First, given the totality of the circumstances, including that Pepe was returning to his home, no rational juror could have found beyond a reasonable doubt that sex acts were a dominant, significant, or motivating (but not merely incidental) purpose of the travel. Second, two counts were based on Pepe's first trip in May 2005, but the government did not present evidence that he engaged in any child-sex acts, or even expressed a desire to do so, until weeks after that,

23

precluding a juror from reasonably inferring that he had the requisite intent at the time of the trip. Third, a rational juror also could not have concluded that the alleged sex acts were anything more than merely incidental to Pepe's second trip later in 2005, the basis for the other two counts. Finally, for two of the counts, the government had to prove *both* that Pepe traveled with the specific intent to have sex with girls under 12 *and* that he subsequently did so. But the government failed to prove any of the girls' ages with the precision required by the reasonable-doubt standard. Even if the Court concludes otherwise, however, evidence that some of the girls were barely under 12 while half or more were older doesn't permit a reasonable inference that Pepe traveled with the specific intent to target girls of the younger age rather than the girls' ages being mere happenstance.

For all these reasons, the Court should reverse Pepe's convictions for insufficient evidence and direct entry of a judgment of acquittal. At a minimum, the Court should reverse and remand for a new trial based on jury-instruction errors.

Pepe had a constitutional right to have the jury instructed on his theory of the case, which was based on the innocent-round-trip precedent. The district court nevertheless refused to give such an instruction. It also made three other errors in instructing the jury on the mens rea elements. The district court said that the

government had to prove that engaging in child-sex acts was "a dominant, significant, or motivating purpose" (instead of the "dominant purpose") of Pepe's travel home.  The district court also refused to give standard language that sex acts could not be "merely incidental" to the travel back to Cambodia.  And after the government's wrongly argued to the jury that it could find that Pepe had the requite mens rea even if his return trips home would have occurred as they did if the purported child-sex purpose didn't exist, the district court denied Pepe's request for a corrective instruction.

# Standards of Review

Where, as here, the defendant preserves the issue of sufficiency of the evidence by making a motion for acquittal, the Court reviews the denial of the motion de novo.  *United States v. Jackson*, 24 F.4th 1308, 1311 (9th Cir. 2022).[123]

The Court generally reviews the formulation of jury instructions for abuse of discretion, but it reviews de novo whether the instructions correctly stated the

_____

[123] Pepe made such motions at the close of the government's case in chief and again at the close of all evidence; each time, the district court reserved ruling.  4-ER-587–88, 685–88, 699–720.  Pepe then filed a post-trial motion for acquittal.  6-ER-1005–57, 1248–64.  The district court denied that motion.  1-ER-15–23.

elements of the offense and adequately covered the defendant's theory of the case.
*United States v. Flucas*, 22 F.4th 1149, 1154 (9th Cir. 2022).

# Argument

## 1. The Court should reverse Michael Pepe's convictions and direct entry of a judgment of acquittal.

The Court should direct a judgment of acquittal as to all counts because no rational juror could have found that the government proved each offense beyond a reasonable doubt.

### A. Trial evidence is insufficient to support a conviction if no rational juror could have found that the government proved each element of the offense beyond a reasonable doubt—in other words, if the juror could not have reached a subjective state of near certitude that Pepe is guilty.

The Due Process Clause required the government to prove each element of each alleged crime beyond reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). This constitutional burden of proof "plays a vital role in the American scheme of criminal procedure" because it's "a prime instrument for reducing the risk of convictions resting on factual error" and it "provides concrete substance for the

presumption of innocence[.]" *Id.* at 363 (cleaned up); *see also United States v. Velazquez*, 1 F.4th 1132, 1137 (9th Cir. 2021) (discussing interests served by reasonable-doubt standard). "To this end, the reasonable-doubt standard is indispensable, for it impresses on the trier of fact the *necessity of reaching a subjective state of certitude* of the facts in issue." *Winship*, 397 U.S. at 364 (cleaned up) (emphasis added); *see also id.* (factfinder must be convinced of guilt with "utmost certainty"); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) ("[B]y impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself.").

A conviction "cannot constitutionally stand" if no rational trier of fact could have found that the government met its burden. *Jackson*, 443 U.S. at 317-18. More than a "mere modicum" of evidence is required to support a verdict. *Id.* at 320 (cleaned up). The relevant question is whether, after viewing the evidence in the light most favorable to the government, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 319. This "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* "A 'reasonable doubt,' at a

minimum, is one based upon 'reason.'" *Id.* at 317.  Accordingly, a "reasonable inference is one that is supported by a chain of logic rather than mere speculation dressed up in the guise of evidence." *United States v. Navarrete-Aguilar*, 813 F.3d 785, 793 (9th Cir. 2015) (cleaned up); *see also United States v. Mendoza*, 25 F.4th 730, 736 (9th Cir. 2022) ("[W]e need not heed evidentiary theories, or affirm jury verdicts, that are based on mere speculation.") (cleaned up); *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) ("[S]peculation and conjecture cannot take the place of reasonable inferences and evidence.") (cleaned up).  A reviewing court must consider all "the evidence, including any evidence of innocence or lack of evidence of guilt[.]" *Mendoza*, 25 F.4th at 736 (cleaned up).

The Supreme Court has recognized that "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt[.]" *Jackson*, 443 U.S. at 317.  This Court has the "obligation" to identify such cases, "where *mere speculation*, rather than reasonable inference, supports the government's case, *or* where there is a *total failure of proof* of a requisite element." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc) (cleaned up) (emphasis added).

Fulfilling this duty requires a particularly careful and conscientious sufficiency review when a jury finds a defendant guilty of child-sex crimes, especially where

28

(as here) the issue is whether he should have been acquitted even if he committed the child-sex acts. "[C]hild sex crimes are among the most egregious and despicable of societal and criminal offenses." *United States v. Hall*, 965 F.3d 1281, 1299 (11th Cir. 2020) (cleaned up). As a result, evidence of such crimes "will always be emotionally charged and inflammatory[.]" *United States v. LeMay*, 260 F.3d 1018, 1030 (9th Cir. 2001); *cf. United States v. Cox*, 963 F.3d 915, 925 n.48 (9th Cir. 2020) (sex-crimes evidence "will always present the possibility of extreme prejudice" for purposes of Fed. R. Evid. 403) (cleaned up), *cert. denied*, 141 S. Ct. 1281 (2021). It follows that a jury of laypersons hearing such evidence may "enter a verdict on the basis of emotion rather than fact[.]" *Cf. United States v. Nobari*, 574 F.3d 1065, 1076 (9th Cir. 2009) (discussing prosecutorial appeals "to the passions, fears and vulnerabilities of the jury.") (cleaned up). Indeed, the Court itself must guard against allowing disgust for sex crimes to color its judgment in evaluating the legal sufficiency of the evidence. *United States v. Navrestad*, 66 M.J. 262, 268 n.13 (C.A.A.F. 2008).

If the evidence is insufficient as to any element, the Court must reverse the conviction and direct entry of a judgment of acquittal because the Double Jeopardy Clause precludes a retrial. *Burks v. United States*, 437 U.S. 1, 18 (1978). Given that remedy, the Court must review an insufficient-evidence claim even where

other trial error would require a new trial. *United States v. Bibbero*, 749 F.2d 581, 586 (9th Cir. 1984).

**B. Because all the alleged sex acts occurred at Pepe's Cambodian home, precedent precludes finding that the return legs of his innocent round trips to the United States were made for the purpose of engaging in the sex acts.**

Counts 1 and 2 required the government to prove that Pepe traveled in foreign commerce "for the purpose of engaging in" certain sexual conduct. *See* 18 U.S.C. § 2423(b) (2005). Similarly, Counts 3 and 4 required the government to prove that he crossed a state line "with intent to engage in" certain sexual conduct. *See* 18 U.S.C. § 2241(c) (2005). Despite the slightly-different language, courts have recognized that the statutes' mens rea elements are equivalent. *See*, *e.g.*, *United States v. Perkins*, 948 F.3d 936, 938-39 (8th Cir. 2020); *United States v. Murphy*, 942 F.3d 73, 82 (2d Cir. 2019); *Sealed Appellee v. Sealed Appellant*, 825 F.3d 247, 251-52 (5th Cir. 2016). Accordingly, the government-proffered instructions given by the district court defined both mental-state elements in the same way.[124] Pepe's convictions cannot stand because Supreme Court and Ninth Circuit precedent

---

[124] 2-ER-99–105; 5-ER-755–56, 759; *see infra* Part 2.B.

preclude breaking up Pepe's *innocent round trips* from Cambodia to the United States and back to examine the purported purpose of the return leg of each trip in isolation.

### 1) Stare decisis requires this Court to follow Supreme Court and circuit precedent.

"Stare decisis—in English, the idea that today's Court should stand by yesterday's decisions—is a foundation stone of the rule of law." *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 455 (2015) (cleaned up). The Framers understood the importance of this doctrine. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1411 (2020) (Kavanaugh, J., concurring in part). Stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2422 (2019) (cleaned up). Favoring precedent over "the proclivities of individuals" ensures that "the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Vasquez v. Hillery*, 474 U.S. 254, 265-66 (1986). "Respecting stare decisis means sticking to some wrong decisions" because "it is usually more important that the applicable rule of law be settled than that it be settled right." *Kimble*, 576 U.S. at 455 (cleaned up). Thus, precedent "serves an indispensable

31

institutional role within the Federal Judiciary." *Hubbard v. United States*, 514 U.S. 695, 711 (1995).

"[B]inding authority is very powerful medicine." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). This Court must follow both Supreme Court precedent ("vertical stare decisis") and its own prior precedent ("horizontal stare decisis"). *See Ramos*, 140 S. Ct. at 1416 n.5 (Kavanaugh, J., concurring in part).

Vertical stare decisis is "absolute." *Ramos*, 140 S. Ct. at 1416 n.5 (Kavanaugh, J., concurring in part). "A decision of the Supreme Court will control that corner of the law unless and until the Supreme Court itself overrules or modifies it. Judges of the inferior courts may voice their criticisms, but follow it they must." *Hart*, 266 F.3d at 1171. The alternative would be "anarchy." *Hutto v. Davis*, 454 U.S. 370, 375 (1982). Lower courts' duty to follow Supreme Court decisions persists even when "subsequent cases have raised doubts about their continuing vitality." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (cleaned up).

As for horizontal stare decisis, "the first panel to consider an issue sets the law not only for all the inferior courts in the circuit, but also future panels of the court of appeals." *Hart*, 266 F.3d at 1171. A "later three-judge panel considering a case that is controlled by the rule announced in an earlier panel's opinion has no choice but to apply the earlier-adopted rule; it may not any more disregard the earlier

panel's opinion than it may disregard a ruling of the Supreme Court." *Id.*; *see also Langere v. Verizon Wireless Services, LLC*, 983 F.3d 1115, 1121 (9th Cir. 2020) (noting narrow exceptions to this rule).

**2) The Supreme Court established the innocent-round-trip doctrine in *Mortensen v. United States* and applied it in subsequent cases.**

a) The innocent-round-trip doctrine is rooted in *Mortensen v. United States*, 322 U.S. 369 (1944). The Mortensens (husband and wife) ran a brothel in Grand Island, Nebraska. *Id*. at 372. When two of their employees asked to accompany them on a vacation to Yellowstone and Salt Lake City, they obliged. *Id*. During the trip, there was no prostitution, or even discussions about it. *Id*. It "was purely a vacation trip[.]" *Id*. But when the four travelers returned to Nebraska, the women resumed their work. *Id*. The women were free to leave at any time but returned to Nebraska because that's where they resided. *Id*. at 372-73. "The primary issue" before the Supreme Court was "whether there was any evidence from which the jury could rightly find" that the Mortensens violated the Mann Act by transporting the women back to Nebraska "'for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice and compel [them] to become [] prostitute[s] or to give [themselves]

33

up to debauchery, or to engage in any other immoral practice.'" *Id*. at 373-74
(quoting Mann Act).[125]

Recognizing that the Mann Act aimed "to penalize only those who use
interstate commerce with a view toward accomplishing the unlawful purposes," the
Supreme Court deemed it "essential that the interstate transportation have for its
object or be the means of effecting or facilitating the proscribed activities."
*Mortensen*, 322 U.S. at 374 (cleaned up). The intention for the women to engage
in the proscribed conduct "must be found to exist before the conclusion of the
interstate journey and must be the dominant motive of such interstate movement."
*Id*. "Without that necessary intention and motivation, immoral conduct during or
following the journey is insufficient to subject the transporter to the penalties of the
Act." *Id*.

Given this interpretation, the Supreme Court found that the defendants' actions
did not violate the Mann Act. *Mortensen*, 322 U.S. at 374-77. They presumably
"anticipated that the two girls would resume their activities as prostitutes upon

---

[125] Mann Act cases are authoritative in construing modern travel-for-sex statutes.
*See Sealed Appellee*, 825 F.3d at 251-52; *United States v. Schneider*, 801 F.3d 186,
192 (3d Cir. 2015); *United States v. Garcia-Lopez*, 234 F.3d 217, 220 n.3 (5th Cir.
2000); *United States v. Vang*, 128 F.3d 1065, 1069-70 (7th Cir. 1997).

their return to" the brothel in Nebraska. *Id.* at 374. But that expectation did not permit the jury to infer that "any part" of the interstate vacation trip "was undertaken by" the defendants "for the purpose of, or as a means of effecting or facilitating, such activities." *Id.* at 374-75. "The sole purpose of the journey from beginning to end was to provide innocent recreation and a holiday for petitioners and the two girls. It was a complete break or interlude in the operation of" the brothel "and was entirely disassociated therefrom." *Id.* at 375. "In ordinary speech an interstate trip undertaken for an innocent vacation purpose constitutes the use of interstate commerce for that innocent purpose." *Id.* Congress, however, required "the use of interstate commerce as a calculated means for effectuating sexual immorality." *Id.*

The mere fact that the women resumed prostitution after going home could not "operate to inject a retroactive illegal purpose into the return trip to Grand Island." *Mortensen*, 322 U.S. at 375. Nor could "it justify an arbitrary splitting of the round trip into two parts so as to permit an inference that the purpose of the drive to Salt Lake City was innocent while the purpose of the homeward journey to Grand Island was criminal." *Id.* In other words, the return journey couldn't "be considered apart from its integral relation with the innocent round trip as a whole." *Id.* There was no "change in the purpose of the trip during its course"—it was

35

"innocent when it began" so "it remained so until it ended." *Id*. "Guilt or innocence does not turn merely on the direction of travel during part of a trip not undertaken for immoral ends." *Id*. The return leg of the trip was no more criminal than the outward leg, "since all intended, from the beginning, to end the journey where it began, at Grand Island." *Id*. at 375-76. The "direction of travel" wasn't "enough to make the first part innocent, the last part illegal." *Id*. at 376. Only an "artificial and unrealistic view of the nature and purpose of the return journey to Grand Island" could sustain the defendants' convictions. *Id*. The Supreme Court refused to allow something "so manifestly unfair." *Id*. It held that "to punish those who transport inmates of a house of prostitution on an innocent vacation trip in no way related to the practice of their commercial vice is consistent neither with the purpose nor with the language of the Act." *Id*. at 377 (cleaned up).

In *Mortensen*, the Supreme Court recognized that "'people not of good moral character, like others, travel from place to place and change their residence. But to say that because they indulge in illegal or immoral acts, they travel for that purpose, is to emphasize that which is incidental and ignore what is of primary significance.'" 322 U.S. at 376 (cleaned up). It quoted that language from *Hansen v. Haff*, 291 U.S. 559 (1934). The issue in that immigration case was whether an alien entered the United States for an immoral purpose. The woman was a citizen

36

of Denmark who had been living and working as a domestic servant in Los Angeles for several years. *Id.* at 560. She began an affair with a married man there and he accompanied her on a trip to Denmark to visit her parents. *Id.* at 560-61. They returned to the United States with the intent to continue the affair. *Id.* at 561. But the Supreme Court held "it cannot be said that the petitioner's entry was for the purpose of having such relations." *Id.* at 562. "The fact is that she was returning to her former residence[.]" *Id.* Thus, *Hansen* and *Mortensen* establish that going home after a trip is not for the purpose of engaging in wrongdoing there, even if such activities occurred there before the trip and resumed there afterwards.

b) The year after *Mortensen*, the Supreme Court summarily reversed *United States v. Oriolo*, where the defendant and a woman who worked for him as a prostitute in Philadelphia went to Atlantic City for the day. 146 F.2d 152, 153 (3d Cir. 1944), *reversed*, 324 U.S. 824 (1945). The Mann Act conviction was based on the return trip to Philadelphia. *Id.* The Third Circuit had distinguished *Mortensen* based on the defendant's statement during that trip informing the woman that she would have to resume the business of prostitution to pay off a fine he had incurred in Atlantic City, supposedly reflecting "a change in the purpose of the trip during its course." *Id.* at 153-54. The Supreme Court nevertheless reversed the conviction under *Mortensen*. 324 U.S. at 824.

37

c)  Several years later, the Supreme Court also summarily reversed *Becker v. United States*, 217 F.2d 555 (8th Cir. 1954), *reversed*, 348 U.S. 957 (1955).  In that case, the defendant was convicted of violating the Mann Act when the woman who worked for him as an exotic dancer in Wisconsin returned from a brief trip to visit her family in Minnesota for Thanksgiving.  *Id*. at 555-56.  The Eighth Circuit had distinguished *Mortensen* because the woman (who did not purchase a round trip ticket) was somewhat uncertain about whether she would return to Wisconsin, and the defendant had called her while she was in Minnesota and encouraged her to do so.  *Id*. at 556-57.  Once again, however, the Supreme Court reversed under *Mortensen*.  348 U.S. at 957.

### 3)  This Court applied *Mortensen*'s innocent-round-trip doctrine.

a)  This Court considered *Mortensen* in *Langford v. United States*, 178 F.2d 48 (9th Cir. 1949).  Langford was convicted of a Mann Act violation based on the return leg of a trip he took from Los Angeles to Mexico with a woman (Jones) who worked as his prostitute to marry her there.  *Id*. at 49-51.  He proposed when Jones left him temporarily, telling her that she would have to resume engaging in prostitution after the wedding.  *Id*. at 50.  Even when in Mexico, Jones engaged in prostitution at Langford's direction.  *Id*. at 50-51.  And she resumed such activity the day after they returned to Los Angeles.  *Id*. at 51.

38

In affirming the conviction, the Court recognized that, under *Mortensen*, "the dominant motive for the interstate transportation of the victim must be the purpose proscribed by the statute." *Langford*, 178 F.2d at 51 & n.3 (cleaned up). But it distinguished that case, where "there was no evidence justifying the inference that, had the Mortensens not taken the girls on the interstate vacation trip, the girls would have refused to perform the proscribed activities for the Mortensens." *Id*. at 51. In contrast, "the interstate journey and marriage" in *Langford* "were nothing but a device to" compel Jones's prostitution. *Id*. at 51-52. In other words, the facts were "such that the jury might well disbelieve that the reason for the marriage was the usual one." *Id*. at 52. "In view of the unusual attitude of the appellant towards marriage," the Court thought "the jury were warranted in finding that so far as appellant was concerned his dominant motive for the marriage was to get control of Jones and re-establish a relationship of pander and prostitute from which he profited so extensively, and that the trip, marriage and all, had that primary end in view." *Id*. (cleaned up); *see also id.* ("[T]he whole enterprise, the trip to Mexico, the marriage, and the return, were undertaken to get Jones back to work as a prostitute.") (cleaned up).

For that reason, the Court also distinguished two Fourth Circuit cases that had reversed Mann Act convictions before *Mortensen*. In the first, the object of the

39

interstate transportation was to take the defendant's mistress from Virginia to Maryland to stay there until their child was born and the trip played no part in inducing the commission of a sexual act in Maryland. *Langford*, 178 F.2d at 52 (discussing *Van Pelt v. United States*, 240 F. 346, 348-49 (4th Cir. 1917)). In the other case, the purpose of the trip was to visit the girl's mother, and "although illicit relations were resumed on the return, . . . 'the mere fact that a journey from one state to another is followed by such intercourse, when the journey was not for that purpose, but wholly for other reasons, to which intercourse was not related cannot be regarded as a violation of the statute.'" *Id*. (quoting *Fisher v. United States*, 266 F. 667, 669-70 (4th Cir. 1920)) (cleaned up).

The Court subsequently denied a petition for rehearing in which Langford pointed to the Supreme Court's summary reversal in *Oriolo*. *Langford*, 178 F.2d at 56. This Court explained that the parties in *Oriolo* "simply took a day's outing at Atlantic City, New Jersey, all the time intending to resume the prostitution at Philadelphia." *Id*. The mere fact "that as they left New Jersey on the return trip by train [the defendant] remarked to the woman that she must earn money for him so he could recover his car did not demonstrate a sufficient change of purpose to distinguish the case from the *Mortensen* case." *Id*. *Oriolo* was therefore

40

inapplicable to Langford given what this Court had held "with respect to the whole purpose of the trip to Mexico and return[.]" *Id.*

b) This Court again applied *Mortensen* in *Twitchell v. United States*, 330 F.2d 759 (9th Cir. 1964). The defendant and his wife managed a motel in Everett, Washington, where some of the rooms were used by prostitutes. *Id.* at 760. Occasionally, when the owners were away, a woman named Ryan (not herself a prostitute) ran the front desk of the motel, which included being in charge of the prostitutes. *Id.* Ryan had a drinking problem and went on a binge in Portland, her hometown. *Id.* The defendant and his wife went there, sobered her up, and brought her back to Everett. *Id.* He was then charged under the Mann Act with inducing Ryan to cross a state line for the purpose of having her act as a "madam" at the motel. *Id.* The Court cited *Mortensen* as holding "that the interstate transportation must have, as its 'dominant motive' the purpose defined in the Act." *Id.* It then held that the defendant's conviction could not stand in light of that decision because there was "no showing that Ryan's trip to Portland was for an immoral purpose. It was to visit her home." *Id.* at 761. Because "the dominant purpose" of the trip back to Everett was to get her "sobered up," the record didn't "support a finding that either the or a dominant purpose of that trip was to have her resume immoral activities." *Id.*

41

In addition to *Mortensen*, the *Twitchell* panel considered the Supreme Court's summary reversals in *Oriolo* and *Becker*. 330 F.2d at 761. It also cited three cases where other circuits had reversed Mann Act convictions based on return-home trips in light of *Mortensen*. *Id*.; *see United States v. Hon*, 306 F.2d 52, 54-55 (7th Cir. 1962) (defendant and prostitute went on trip to visit prostitute's family in another state); *United States v. Ross*, 257 F.2d 292, 292-93 (2d Cir. 1958) (defendant and prostitute went on weekend trips out of state for recreation only); *Smart v. United States*, 202 F.2d 874, 875 (5th Cir. 1953) (defendant transported prostitutes to another state for sole purpose of taking care of pending legal matters there). The Court also cited three pre-*Mortensen* cases where the Fourth Circuit "seem[ed] to anticipate" that decision by reversing Mann Act convictions, including the two that had been distinguished in *Langford*. *Twitchell*, 330 F.2d at 761; *see also Hunter v. United States*, 45 F.2d 55, 56-57 (4th Cir. 1930) (defendant arranged woman's trip to another state to visit her family).

**4) This precedent compels the conclusion that the evidence is insufficient to support Pepe's convictions.**

As in *Mortensen*, *Oriolo*, *Becker*, and *Twitchell*, Pepe's alleged sex acts occurred only at the starting point and ending point of his round trips—his home in

Cambodia.[126]  And it was undisputed that he made those trips for the wholly

innocent purpose of visiting his family in the United States.[127]  Thus, unlike in

*Langford*, there is no evidence that those trips were not innocent because they were

meant to further the sexual acts in some way.  On the contrary, each trip was a

"complete break or interlude" in any sexual activity.  *See Mortensen*, 322 U.S. at

375.

During its closing argument, the government claimed that Pepe's home "was

his own personal brothel."[128]  Pepe disagrees with that characterization of "his

everyday life."[129]  But for purposes of the innocent-round-trip doctrine, it just

doesn't matter.  The defendants in *Mortensen* ran a <u>literal</u> brothel, with prostitution

occurring there immediately before and immediately after their trip, and still their

convictions could not stand.  322 U.S. at 372-77.  Indeed, the Supreme Court

---

[126] To be clear, the innocent-round-trip doctrine doesn't require that the starting and ending point be the defendant's home, just that the round trip at issue was taken for a purpose unrelated to whatever criminal activity normally occurred at that point.  But where, as here, the starting and ending point <u>is</u> the defendant's home, the doctrine applies even more strongly.

[127] *Supra* Statement of the Case, Parts 3 & 5.

[128] 5-ER-766.

[129] 5-ER-766; *see infra* Part 1.C.1.

43

rejected the same intent argument the government made to the jury below—that sex with children must have been at least one of Pepe's purposes in returning home.[130]  The government's *Mortensen* brief argued that "the immoral purpose *need not be the sole object* of the journey; the additional presence of a legitimate purpose is immaterial, *if one of the objects* of the transportation falls within the statutory bar."  *Mortensen v. United States*, Brief for the United States, 1944 WL 42874, *21-22 (Mar. 1944) (emphasis added).  Therefore, it continued, "the jury could properly infer that *at least one purpose* of petitioners in transporting the girls back from Salt Lake City was to enable them to resume their immoral conduct, which they did."  *Id*. at *24-25 (emphasis added).  "If a person takes a vacation from an ordinary employment," the government explained, "*one of the purposes* of his return trip would normally be to go back to work; indeed that is often the main reason."  *Id*. at *25 (emphasis added).  Again, the Supreme Court unequivocally rejected this idea that a jury could separate the return trip from the innocent round trip as a whole.[131]

It bears repeating that "people not of good moral character," like the Mortensens and (allegedly) Pepe, "travel from place to place and change their

---

[130] 5-ER-780.

[131] *Supra* Part 1.B.2.

residence. But to say that because they indulge in illegal or immoral acts, they travel for that purpose, is to emphasize that which is incidental and ignore what is of primary significance." *Mortensen*, 322 U.S. at 376 (cleaned up). Only an "artificial and unrealistic view of the nature and purpose of" Pepe's "return journey[s]" to Cambodia can sustain his convictions. *Id*. Each return journey "cannot be considered apart from its integral relation with the innocent round trip as a whole." *Id*. at 375. Each trip was "innocent when it began," so "it remained so until it ended" because "guilt or innocence does not turn merely on the direction of travel during part of a trip not undertaken for immoral ends." *Id*. (cleaned up). Pepe's convictions therefore must be reversed.

**C. Even if the Court could ignore the innocent-round-trip precedent, the evidence was insufficient to prove the mens rea elements.**

Even if the jury (or the Court) could disregard the innocent nature of Pepe's round trips and consider the return legs of those trips in isolation, the government still failed to prove the requisite mental states. As discussed below, Pepe disputes the mens rea instructions given by the district court, which told the jury that the government had to prove that child-sex acts were a dominant, significant, or motivating purpose of each of Pepe's return trips to Cambodia, but did not inform the jury that the child-sex acts had to be more than merely incidental to the

travel.[132]  The Court must properly define the mens rea elements, not only for
purposes of the jury-instruction arguments below, but also to judge the sufficiency
of the evidence.  *See Musacchio v. United States*, 577 U.S. 237, 243-45 (2016)
(sufficiency assessed against actual elements, regardless of any erroneous jury
instructions to the contrary).  But for the reasons given here, the evidence was
insufficient under any articulation of the mens rea elements.

**1)  No rational juror could have found beyond a reasonable doubt that
sex acts were a dominant, significant, or motivating—but not merely
incidental—purpose of Pepe's return trips home.**

Because Pepe was traveling for the purpose of returning to his home, engaging
in any sex acts there could not have been a dominant, significant, or motivating
purpose of his travel; at best, any such acts (if they occurred at all) were merely
incidental to the homeward-bound trips.  *See Mortensen*, 322 U.S. at 376 (to say
that people of poor moral character necessarily travel for purpose of engaging in
illegal or immoral acts "emphasize[s] that which is incidental and ignore[s] what is
of primary significance.") (cleaned up).  Once he traveled to the United States for
family functions, he had to get home.  Thus, the return trips would have happened

---

[132] *Infra* Part 2.B.

whether he intended to have sex with minors there or not.  Indeed, the jury learned of two similar trips in 2003 and 2004.[133]  Given that Pepe went home then despite no proof he was having sex with minors (or even contemplating doing so) at that time, it necessarily follows that such activity could not have been a sufficient purpose of his return trips in 2005 because he clearly would have gone home anyway.

The government attempted to avoid this conclusion with its "brothel" argument—that Pepe's "everyday life" in Cambodia purportedly was so focused on sex with minors that it was his motivating purpose in returning there each time in 2005.[134]  Trying to parse out what parts of a person's entire homelife motivate his trip home at the end of a vacation and what parts are merely incidental to that travel demonstrates the wisdom of *Mortensen*'s innocent-round-trip doctrine, which precludes such an inquiry.[135]  Again, even though it was undisputed that the Mortensens traveled back to Nebraska with the understanding that their companions would resume their work as prostitutes at the brothel they ran, that

---

[133]  *Supra* Statement of the Case, Part 2.F.

[134]  5-ER-766.

[135]  *Supra* Part 1.B.2.

could not establish that as the purpose of that travel. 322 U.S. at 372-77. The government's argument simply can't be reconciled with *Mortensen*.[136]

Even if the Court could ignore that, the government's argument fails given the evidence establishing that Pepe maintained a long-term residence in Cambodia beginning in March 2003 and engaged in normal day-to-day activities, including employment, a romantic relationship, and community service.[137] Such activities continued even after he purportedly began having sex with minors.[138] The evidence did not permit a rational juror to find beyond a reasonable doubt that the illicit sex *ever* became so significant that it was anything more than incidental to Pepe's return trips in 2005—in other words, that but for such activity, he would have traveled to the United States for his son's graduation and his daughter's wedding *and stayed there*, abandoning the home and entire life he had built in Cambodia.

For these reasons, all four counts must be reversed.

---

[136] *Supra* Part 1.B.4 (noting that in *Mortensen* the government made, and the Supreme Court rejected, the same basic argument it made here).

[137] *Supra* Statement of the Case, Part 2.

[138] *Supra* Statement of the Case, Parts 4 & 6.

48

**2) The government presented no evidence that Pepe engaged in any child-sex acts, or even expressed a desire to do so, until weeks after his May 2005 trip, so no rational juror could have found beyond a reasonable doubt that he intended to engage in such acts as he traveled back to Cambodia for purposes of Counts 1 and 3.**

Again, the evidence establishes that Pepe moved to Cambodia in March 2003 and built a life there.[139] The government did not even allege that he engaged in any sex acts with minors until more than two years later in June 2005.[140] That was weeks *after* his May 2005 round trip to the United States.[141] The government presented no evidence that would permit a *reasonable* inference that Pepe engaged in such acts *before* then, or even intended to do so; such a conclusion would be pure speculation given the trial record. Consequently, no rational juror could have concluded beyond a reasonable doubt that a dominant, significant, or motivating purpose for Pepe's May 2005 return trip to Cambodia was to engage in sex with minors. The Court should therefore reverse Counts 1 and 3, which are based on that trip.

---

[139] *Supra* Statement of the Case, Part 2.

[140] *Supra* Statement of the Case, Part 4.

[141] *Supra* Statement of the Case, Part 3.

49

**3) Because the government failed to prove that Pepe engaged in any additional child-sex acts until two months after his September 2005 trip, no rational juror could have found beyond a reasonable doubt that such sex acts were anything more than merely incidental to his travel back to Cambodia for purposes of Counts 2 and 4.**

A similar problem exists with regard to Counts 2 and 4, which are based on Pepe's September 2005 return trip.[142]  The only post-trip sex acts purportedly proved by the government did not occur until two months later.[143]  Under these circumstances, no rational juror could find beyond a reasonable doubt that such sporadic activity was a dominant, significant, or motivating purpose for Pepe's trip back to Cambodia at that time, rather than just incidental to his purpose in going home.  As a result, the Court should reverse these counts.

---

[142] *Supra* Statement of the Case, Part 5.

[143] *Supra* Statement of the Case, Part 6.

50

**4) Even if Pepe traveled for the purpose of engaging in sex acts with minors, a rational juror could not have found beyond a reasonable doubt that he traveled with the specific intent to engage in such acts with girls *under 12* for purposes of Counts 3 and 4, let alone that any of the alleged victims were actually that age.**

For Counts 3 and 4, it was not enough for the government to prove that Pepe intended to have sex with minors; it had to prove *both* that he traveled with the specific intent to engage in sex acts with someone under 12 *and* that he then actually did so.[144] The government failed to prove the ages of any of the girls at the relevant times with the precision required by the reasonable-doubt standard, and that's reason enough to reverse. But even if it did prove that certain alleged victims were under 12 when Pepe abused them, the trial evidence does not permit a reasonable inference (rather than mere speculation) that he had the specific intent to target such girls when he returned home to Cambodia in May and September 2005.

a) *Insufficient Evidence of Age*. Dr. Laura Watson examined some of the girls in Cambodia in 2006 and 2007.[145] She explained that "ages and dates of birth and

---

[144] 5-ER-757–59.

[145] 2-ER-137–464

birthdays are quite difficult in Cambodia" because "it's really common for people not to know their birthdates and it's not a big deal[.]"[146] Dr. Watson testified that a girl's "zodiac year" allowed her to "roughly" work out when she was born, but it wasn't her job "to obtain a really precise age."[147] The government therefore relied on "family books," which are purportedly "equivalent to a birth certificate in the United States[,]" that list family members' names and birthdates.[148] The government presented pages from family books and translations of those pages, but no expert testified on how to interpret them or to opine on their reliability.[149]

    i) <u>Count 3</u>. The sole under-12 victim alleged in this count was K.S. (supposedly at Pepe's home in August 2005).[150] Dr. Watson's contemporaneous report of her examination of K.S. in June 2007 stated her "reported age" as 14 years old; because the date of birth was "unknown," Dr. Watson testified that she would have based the age on K.S.'s reported "zodiac year," even though her report

---

[146] 2-ER-151.

[147] 2-ER-151, 160, 164; *see also* 2-ER-152–53; 6-ER-1209–13.

[148] 9-ER-1504.

[149] 2-ER-176; 9-ER-1502–09, 1516.

[150] 2-ER-78; 4-ER-757–58; *supra* Statement of the Case, Part 4.

said no such thing.[151]  But Dr. Watson agreed "that the state of her [physical] development was consistent with the stated age of 14 in 2007[.]"[152]

K.S. testified that her birthday was a particular day in the summer of 1994.[153] But when she was interviewed by American agents in September 2006, she said she did not know her birthdate but was 13 years old (which would have put her birthday in 1993, consistent with what she later told Dr. Watson in June 2007).[154] At trial, she said, "I was young, so I did not know when my birth date was so I kind of guessed."[155]  She admitted that she also did not know her birthdate when she talked to Dr. Watson and that Cambodians generally "don't care about the birth dates."[156]  K.S. also said that nobody told her what her birthdate is because her "family didn't remember it either."[157]  She also had no birth certificate or similar "papers."[158]  She said that an NGO later found her family book and told her she

---

[151] 2-ER-158, 160–62.

[152] 2-ER-162.

[153] 3-ER-366–37, 379; 8-ER-1420.

[154] 3-ER-379.

[155] 3-ER-379.

[156] 3-ER-379.

[157] 3-ER-380.

[158] 3-ER-380.

was born in 1994, but she has never looked at the book herself.[159]  In fact, she testified, "We have never seen it, even our family did not know where the family book was at the time."[160]  Nor could K.S. interpret the family book when shown to her at trial.[161]

The government nevertheless relied on a family-book pages stating a 1994 birthdate for K.S.[162]  The case agent supposedly got those pages from a "village chief," apparently when he investigated the case before Pepe's first trial in 2008.[163]  Despite that, when the government sought a visa for K.S. in 2013, an ICE agent submitted a declaration stating that "[a]ccording to [K.S.'s] Cambodian passport, her birthdate is [in] 1994" while acknowledging that "Cambodia did not create and maintain official records of birth for all of its citizens" at that time.[164]  The agent also declared that, "[w]ith great difficulty, [K.S.] may be able to obtain 'Family Papers'; however, even if those papers exist, *their accuracy is unknown*."[165]  The

---

[159] 3-ER-380–81.

[160] 3-ER-381.

[161] 3-ER-381–83.

[162] 2-ER-176; 9-ER-1508–09; 10-ER-1771–74.

[163] 9-ER-1516.

[164] 6-ER-1101–02.

[165] 6-ER-1102 (emphasis added).

following month, one of the original prosecutors in this case also submitted a declaration in support of the visa application, stating that "[a]t the time of the crimes charged[,]" K.S. "was approximately 11 to 12 years old."[166] Thus, even the government could not state under penalty of perjury that K.S. was *under 12* at the relevant times.

Given K.S.'s inconsistent statements about her birthdate, her admission that it wasn't important to her and her family (typical in Cambodia), the lack of any evidence that the family-book pages were sufficiently reliable, and the government waffling on the matter when making statements under penalty of perjury, no rational juror could have found beyond a reasonable doubt that she was under 12 at the relevant time, so Count 3 must be reversed.

ii. Count 4. The under-12 victims alleged in this count were S.R. (supposedly at Pepe's home in November 2005), S.S. (supposedly there in December 2005), and I.T. (supposedly there in April 2006).[167]

---

[166] 6-ER-1106.

[167] 2-ER-79–80; 4-ER-758–59; *supra* Statement of the Case, Part 6.

S.S. and S.R. are sisters, with S.R. being about one year older.[168]  At trial, S.R. testified that her birthday was a particular day in the spring of 1996.[169]  And S.S. testified that her birthday was a particular day in early 1995.[170]  But they never celebrated birthdays in Cambodia.[171]  To buttress their testimony, the government presented family-book pages indicating that the women were born in those years— *but on different months and days than the witnesses stated*.[172]

Dr. Watson examined I.T. in June 2006 and noted in her contemporaneous report that she was 12 years old.[173]  At trial 15 years later, however, Dr. Watson said that "if" I.T. had only given her zodiac year, then "it's *possible* that she wasn't 12 years old[.]"[174]  But Watson's report made no mention of the zodiac calendar.[175]  And her June 2006 report reflected that I.T.'s physical development was consistent with the stated age of 12.[176]

---

[168] 2-ER-225; 3-ER-431.

[169] 2-ER-223–24; 8-ER-1428–29.

[170] 3-ER-430; 8-ER-1436.

[171] 2-ER-226.

[172] 2-ER-176; 9-ER-1504; 10-ER-1726.

[173] 2-ER-150–51, 162.

[174] 2-ER-151 (emphasis added).

[175] 2-ER-162.

[176] 2-ER-163.

At trial, I.T. initially testified that her birthday was on a particular day in early 1994, which would have made her 12 years old at the relevant time.[177] But later, when the government asked, "do you have a birthday in [a later month]" that would make her 11 at that time, I.T. responded yes, changing her testimony to alter both the month and the day of the birthdate she previously gave.[178] The government never asked her to explain why she gave the other birthdate before it prompted her to change it; nor did the government present any family-book pages to establish I.T.'s age.

For these reasons, the evidence did not permit a rational juror to find beyond a reasonable doubt that any of the girls named in Counts 3 and 4 (let alone all of them) were under 12, so those convictions must be reversed.

b) *Insufficient Evidence of Intent.* Even if these girls were under 12, the government didn't prove that Pepe intended to target such girls at the time of each trip.

First, as noted above, there was no evidence of any sex acts with minors until *after* the May trip.[179] Even if the Court could somehow conclude that Pepe

---

[177] 3-ER-446; 8-ER-1438.

[178] 3-ER-459; 8-ER-1439.

[179] *Supra* Part 1.C.2.

nevertheless had the intent to engage in such acts during his return trip, it certainly couldn't make the additional leap that he specifically intended to do so with girls under 12.

Even if the government could get past that insurmountable hurdle, the evidence was that weeks after the May trip, Basang brought her two nieces (N.P. and K.S.) to Pepe's house.[180]  N.P. did not recall her age at the time, but it was less than 18 and maybe less than 16.[181]  Thus, even if one ignores the problems with K.S.'s age, the evidence (at best) showed that one of Basang's nieces happened to be under 12 and the other was over 12, perhaps years older.  A juror could not rationally conclude from that that K.S. being under 12 (if she was) demonstrated a specific intent *in May* to eventually abuse a girl of that age rather than simply accepting the girls that Basang could procure in June.

Similarly, of the six girls Pepe allegedly abused starting two months after his September 2005 return trip to Cambodia, only three (S.S., S.R., and I.T.) were purportedly under 12.  As for the others, L.K. testified that she was 12 or 13 when she went to Pepe's house.[182]  And N.T.D. testified that her birthday was a

---

[180] *Supra* Statement of the Case, Part 4.

[181] 2-ER-502–03.

[182] 2-ER-299, 301–02; 3-ER-326; 8-ER-1431.

particular day in early 1993 that would have made her 13 years old when she went to Pepe's house in April 2006.[183]  Finally, T.C. testified that she was born on a day in 1993 that would have made her almost 13 years old when she went to Pepe's house around Valentine's Day 2006.[184]  Thus, during this period, half of the victims happened to be under 12 (purportedly) and half were not, and the three that supposedly were did not arrive at Pepe's house until late November / early December 2005 (S.S. and S.R.) or April 2006 (I.T.)—months after Pepe got back to Cambodia on September 3.[185]

From this evidence, a rational juror could only speculate that Pepe intended (at any time) to specifically target girls under 12.  Rather, the only reasonable inference is consistent with Basang's testimony that Pepe "liked skinny girls.  It doesn't matter if the girl is young or old.  It doesn't matter."[186]  She said Pepe liked her (an adult) because she was skinny.[187]  Similarly, some of the witnesses mentioned another "girl" named Ngoc engaging in sexual activity with Pepe while

---

[183] 3-ER-413–14, 416; 8-ER-1434.

[184] 3-ER-384–85, 388–89.

[185] 2-ER-179; *supra* Statement of the Case, Part 6.

[186] 9-ER-1664.

[187] 9-ER-1664.

they were around,[188] but Ngoc was at least 19 years old at the time.[189]  Given that even the minors were all of different ages, the evidence reflects that if any particular girl was under 12, that was the result of happenstance rather than a specific intent to seek out such girls.  Accordingly, Counts 3 and 4 should be reversed.

## 2. At a minimum, the Court should reverse all of Pepe's convictions and remand for a new trial.

If the Court does not reverse for insufficient evidence, it should at least reverse and remand for a new trial under proper jury instructions.

### A. The district court erred in not giving a defense-theory jury instruction based on *Mortensen*.

"A criminal defendant has a constitutional right to have the jury instructed according to his theory of the case, provided that the requested instruction is supported by law and has some foundation in evidence."  *United States v. Ocampo-Estrada*, 873 F.3d 661, 665 (9th Cir. 2017) (cleaned up); *see also United States v. Cortes*, 757 F.3d 850, 857-58 (9th Cir. 2014) (instruction required if evidence

---

[188] 2-ER-234–40, 247, 249, 253–54, 257, 309–10; 3-ER-334–39, 345.

[189] 6-ER-1059; 9-ER-1651–52.

makes defense theory applicable, even if evidence is weak, insufficient, inconsistent, or of doubtful credibility).  Indeed, "the right to present a defense would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense."  *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002) (cleaned up).

Pepe requested a defense-theory instruction based on *Mortensen*: "One who takes an innocent round trip—that is, leaves his residence to travel elsewhere for purposes unrelated to criminal sexual activity and then returns to his residence— does not travel with the purpose of engaging in illicit sexual conduct (as required for Counts 1 and 2) or the intent to engage in a sexual act with a person who was under the age of twelve years (as required for Counts 3 and 4), even if such conduct occurred at that residence before the trip and resumed after the trip."[190]  He also proposed three alternative defense-theory instructions based on *Mortensen*.[191]  The government opposed any such instruction, arguing that *Mortensen* was inapplicable.[192]  Although the district court recognized that "*Mortensen* is somewhat analogous[,]" it didn't "think *Mortensen* really controls here[,]" so it

---

[190] 4-ER-694, 712, 729.

[191] 4-ER-696, 729–30.

[192] 4-ER-723–24.

refused to give any defense-theory instruction.[193] That was reversible error. As explained above, the trial evidence is insufficient to sustain Pepe's convictions under *Mortensen* and its progeny.[194] At the very least, the evidence supports a strong defense based on that precedent. A jury properly instructed on the innocent-round-trip doctrine therefore should not have convicted Pepe, as the district court acknowledged at one point.[195]

## B. The district court erred in defining the mens rea elements for the jury.

The district court gave these government-requested instructions with regard to the offenses' mens rea elements:

> [T]he government does not have to prove that defendant [traveled in foreign commerce / crossed a state line] for the sole and exclusive purpose of engaging in [illicit sexual conduct / a sexual act with a person who was under the age of 12 years]. A person may have different purposes or motives for travel and each may prompt in varying degrees the act of making the journey. For [each count], the government must prove beyond a reasonable doubt that a dominant,

---

[193] 1-ER-11–12, 17–19; 4-ER-696, 742-43, 851; 7-ER-1271.

[194] *Supra* Part 1.B.

[195] 4-ER-694.

significant, or motivating purpose of defendant's [travel in foreign commerce / crossing a state line] was to engage in [illicit sexual conduct / a sexual act with a person who was under the age of 12 years].[196]

The district court erred for three reasons.

1) Pepe objected to the district court's mens rea instructions, arguing that the jury should instead be instructed that the government "must prove beyond a reasonable doubt that he [traveled / crossed state lines] for the sole or dominant purpose of engaging in [illicit sexual conduct with another person / a sexual act with a person under the age of twelve]."[197]  Those instructions are consistent with *Mortensen*'s holding that the improper purpose must be "the dominant motive" for the travel.  322 U.S. at 374; *see also Hawkins v. United States*, 358 U.S. 74, 79 & n.6 (1958) (applying dominant-motive standard); *Cleveland v. United States*, 329 U.S. 14, 19-20 (1946) (same).

Pepe maintains that his proposed instructions were required despite *United States v. Flucas*, where the Court approved "dominant, significant, or motivating purpose" language for § 2423(a).  22 F.4th 1149, 1154-64 (9th Cir. 2022).  Judge

---

[196] 4-ER-755–56, 759; *see also* 1-ER-3–4; 2-ER-83, 88, 95–96, 100–01, 104–05.

[197] 4-ER-84–85, 89–90.

Bybee dissented, concluding *Mortensen* and other precedent required that the illicit sex had to be "one of the dominant or significant purposes" of the travel.  *Id*. at 1165-79.  But even the majority apparently recognized that the result would be different as to the version of § 2423(b) at issue here, given a non-retroactive 2018 amendment changing the phrase "for the purpose of" to "with a motivating purpose of."  *Id*. at 1163-64; *see also id*. at 1176-77 (Bybee, CJ, dissenting) ("By making 'motivating purpose' the standard in § 2423(b), Congress lowered the government's burden of proof for conviction.").  That change makes sense only if the prior version of the statute—the one at issue here—requires *more* than a motivating purpose.  *See United States v. Pepe*, 895 F.3d 679, 682, 686-92 (9th Cir. 2018) (amendment of § 2423(c) to cover U.S. citizens residing in foreign countries demonstrated that prior version didn't cover such persons).

2)  Even if *Flucas* supports the "dominant, significant, or motivating purpose" language given here, the Court allowed that only in conjunction with this additional instruction: "In other words, the government must prove that the criminal sexual activity was not merely incidental to the transportation."  22 F.4th at 1154; *see also id.* at 1159-60, 1162 (emphasizing incidental language in given jury instructions); *id*. at 1155, 1157, 1159-60 (noting other cases involving not-merely-incidental language); *United States v. Lukashov*, 694 F.3d 1107, 1118-19

(9th Cir. 2012) (applying instruction with not-merely-incidental language). The government originally proposed instructions that included such language.[198] But after the district court had accepted those,[199] the government asked to change its own proposed instructions to eliminate that sentence "in an abundance of caution[,]" claiming that it understated the government's burden.[200] Even though the government purportedly proposed the change for his benefit, Pepe recognized that it actually prejudiced him and objected.[201] Noting that the government was conspicuously vague about what exactly it was afraid of, Pepe pointed out that the Court could—and should—*strengthen* the "merely incidental" language by adding that "the government must prove that the [illicit sexual conduct / engaging in a sexual act with a person under twelve] was *substantially more than* merely incidental," but to *eliminate* the "not merely incidental" language would improperly lower the government's burden by failing to explain that, at the very least, "merely incidental" isn't enough.[202] Thus, he argued, the instruction with the "merely incidental" language "is the minimum the defense is entitled to, such that

---

[198] 4-ER-83, 88.

[199] 1-ER-3–4; 4-ER-95–96.

[200] 2-ER-100–01, 104–05.

[201] 1-ER-8; 2-ER-101; 4-ER-713–15.

[202] 4-ER-714-15.

it would be reversible error" to strike it.[203]  The district court nevertheless again gave the government what it wanted and did so.[204]

In *Mortensen*, the Supreme Court explained: "People not of good moral character, like others, travel from place to place and change their residence.  But to say that because they indulge in illegal or immoral acts, they travel for that purpose, is to emphasize that which is incidental and ignore what is of primary significance."  322 U.S. at 376 (cleaned up).  Thus, even as circuit courts wrongly watered-down *Mortensen*'s "dominant purpose" language, they consistently held that however the requisite mens rea is defined, it does not include when sexual activity is "merely incidental" to travel.  *See*, *e.g.*, *Perkins*, 948 F.3d at 938-39; *United States v. Duffin*, 844 F.3d 786, 790 (8th Cir. 2016); *United States v. McGuire*, 627 F.3d 622, 624-25 (7th Cir. 2010).

The Fifth Circuit put it this way: "'dominant motive' is equated with 'motivating purpose,' and if a particular purpose is not motivating, then it is merely non-existent or incidental."  *Garcia-Lopez*, 234 F.3d at 220.  In *Flucas*, Judge Schroeder similarly thought "dominant," "significant," and "motivating" were "interchangeable" words with no "perceptible difference."  22 F.4th at 1165.  But

---

[203] 2-ER-101.

[204] 1-ER-6, 8–9; 3-ER-496, 498–99.

Judge Bybee didn't "think that 'motivating' can't bear the same weight as either 'dominant' or 'significant.'" *Id.* at 1174-75. The majority's opinion is silent on the matter. *Id.* at 1150-64.

The dictionary supports Judge Bybee's position that the three terms mean different things. *See* New Oxford American Dictionary at 514 (3d ed. 2010) (defining "dominant" as "most important, powerful, or influential"); *id.* at 1626 (defining "significant" as "sufficiently great or important to be worthy of attention"); *id.* at 1141 (defining "motivation" as "the reason or reasons one has for acting of behaving in a particular way"). But if experienced judges can't agree on the matter, lay jurors are likely to be confused by the terminology. Thus, the instructions approved in *Flucas* and other cases—juxtaposing "dominant, significant, or motivating purpose" with "not merely incidental"—recognize that juries are likely to construe the first phrase too broadly if not told what it doesn't include. Indeed, having successfully eliminated the not-merely-incidental language after initially proposing it, the government took advantage of that, arguing to the jury that the purported sex acts were a qualifying purpose of Pepe's return trip home because they were part of his entire life there,[205] even though

---

[205] 4-ER-761–804, 839–44.

that's exactly what the above-quoted language from *Mortensen* says is not the proper analysis.

3) The prejudice caused by the government-requested elimination of the not-merely-incidental language was compounded by the third jury-instruction error. During closing arguments, Pepe argued that if the return trips home would have happened anyway, regardless of any sex acts, the sex acts could not have been a dominant, significant, or motivating purpose of the travel.[206] In its rebuttal argument, the government responded, "That's not the standard. That's not what the judge told you."[207] Pepe objected that that misstated the law and renewed his request for a defense-theory instruction, particularly the version stating: "One does not have the requisite purpose/intent if the travel/crossing a state line would have still taken place even had a sex motive not been present."[208] The district court refused.[209]

Pepe was right. Given the dictionary definitions stated above, a dominant, significant, or motivating purpose for travel must mean that the travel would not

---

[206] 4-ER-810–19, 836–37.

[207] 4-ER-840.

[208] 4-ER-851; 3-ER-730.

[209] 4-ER-851–52.

have occurred as it did if that purpose didn't exist.  Otherwise, the purpose could have been, at most, merely "incidental."  *See* New Oxford American Dictionary at 878 (defining "incidental" as "accompanying but not a major part of something").  Consistent with the plain language of these terms, Judge Posner wrote: "It would be better to ask whether, had a sex motive not been present, the trip would not have taken place or would have differed substantially."  *McGuire*, 627 F.3d at 625.  That observation is accordance with the instruction Pepe requested and deserved.

These jury-instruction errors were not harmless, individually or cumulatively.  As explained above, the trial evidence is insufficient to prove the mens rea elements for any of the counts.[210]  At the very least, the government's evidence is weak enough that the jury-instruction errors affected the verdicts.

---

[210] *Supra* Part 1.C.

# Conclusion

For the foregoing reasons, the Court should reverse all of Pepe's convictions, vacate the judgment and restitution order, and direct entry of a judgment of acquittal, or at least remand for a new trial.

August 15, 2022

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

_____/s/ *James H. Locklin*_____
JAMES H. LOCKLIN
Deputy Federal Public Defender

# Certificate of Related Cases

Counsel for appellant is unaware of any cases currently pending in this Court that are related for purposes of Circuit Rule 28-2.6.

August 15, 2022                                   /s/ *James H. Locklin*
                                                  JAMES H. LOCKLIN
                                                  Deputy Federal Public Defender

                                                  *Counsel for Defendant-Appellant*

# Certificate of Compliance for Brief

This brief contains 13,955 words, excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-

1.

August 15, 2022                          ____/s/ *James H. Locklin*_____
                                         JAMES H. LOCKLIN
                                         Deputy Federal Public Defender

                                         *Counsel for Defendant-Appellant*

# Addendum

18 U.S.C. § 2241 (2005) ............................................................. 1a

18 U.S.C. § 2423 (2005) ............................................................. 3a

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 109A. Sexual Abuse (Refs & Annos)

This section has been updated. Click here for the updated version.

18 U.S.C.A. § 2241

§ 2241. Aggravated sexual abuse

Effective: October 30, 1998 to January 4, 2006

**(a) By force or threat.**--Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly causes another person to engage in a sexual act--

    **(1)** by using force against that other person; or

    **(2)** by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping;

or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.

**(b) By other means.**--Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly--

    **(1)** renders another person unconscious and thereby engages in a sexual act with that other person; or

    **(2)** administers to another person by force or threat of force, or without the knowledge or permission of that person, a drug, intoxicant, or other similar substance and thereby--

        **(A)** substantially impairs the ability of that other person to appraise or control conduct; and

        **(B)** engages in a sexual act with that other person;

or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.

**(c) With children.**--Whoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly engages in a sexual act with another person who has not attained the age of 12 years, or knowingly engages in a sexual act under the circumstances described in subsections (a) and (b) with another person who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than the person so engaging), or attempts to do so, shall be

Addendum 1a

fined under this title, imprisoned for any term of years or life, or both. If the defendant has previously been convicted of another Federal offense under this subsection, or of a State offense that would have been an offense under either such provision had the offense occurred in a Federal prison, unless the death penalty is imposed, the defendant shall be sentenced to life in prison.

**(d) State of mind proof requirement.**--In a prosecution under subsection (c) of this section, the Government need not prove that the defendant knew that the other person engaging in the sexual act had not attained the age of 12 years.

**CREDIT(S)**

(Added Pub.L. 99-646, § 87(b), Nov. 10, 1986, 100 Stat. 3620, and amended Pub.L. 103-322, Title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 2150; Pub.L. 104-208, Div. A, Title I, § 101(a) [Title I, § 121, subsection 7(b)], Sept. 30, 1996, 110 Stat. 3009-31; Pub.L. 105-314, Title III, § 301(a), Oct. 30, 1998, 112 Stat. 2978.)

18 U.S.C.A. § 2241, 18 USCA § 2241
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 2a

United States Code Annotated
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part I. Crimes (Refs & Annos)
         Chapter 117. Transportation for Illegal Sexual Activity and Related Crimes (Refs & Annos)

This section has been updated. Click here for the updated version.

18 U.S.C.A. § 2423

§ 2423. Transportation of minors

Effective: April 30, 2003 to July 26, 2006

**(a) Transportation with intent to engage in criminal sexual activity.**--A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 5 years and not more than 30 years.

**(b) Travel with intent to engage in illicit sexual conduct.**--A person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

**(c) Engaging in illicit sexual conduct in foreign places.**--Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

**(d) Ancillary offenses.**--Whoever, for the purpose of commercial advantage or private financial gain, arranges, induces, procures, or facilitates the travel of a person knowing that such a person is traveling in interstate commerce or foreign commerce for the purpose of engaging in illicit sexual conduct shall be fined under this title, imprisoned not more than 30 years, or both.

**(e) Attempt and conspiracy.**--Whoever attempts or conspires to violate subsection (a), (b), (c), or (d) shall be punishable in the same manner as a completed violation of that subsection.

**(f) Definition.**--As used in this section, the term "illicit sexual conduct" means (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or (2) any commercial sex act (as defined in section 1591) with a person under 18 years of age.

**(g) Defense.**--In a prosecution under this section based on illicit sexual conduct as defined in subsection (f)(2), it is a defense, which the defendant must establish by a preponderance of the evidence, that the defendant reasonably believed that the person with whom the defendant engaged in the commercial sex act had attained the age of 18 years.

Addendum 3a

**CREDIT(S)**

(June 25, 1948, c. 645, 62 Stat. 812; Feb. 6, 1978, Pub.L. 95-225, § 3(a), 92 Stat. 8; Nov. 7, 1986, Pub.L. 99-628, § 5(b)(1), 100 Stat. 3511; Sept. 13, 1994, Pub.L. 103-322, Title XVI, § 160001(g), 108 Stat. 2037; Dec. 23, 1995, Pub.L. 104-71, § 5, 109 Stat. 774; Oct. 11, 1996, Pub.L. 104-294, Title VI, §§ 601(b)(4), 604(b)(33), 110 Stat. 3499, 3508; Oct. 30, 1998, Pub.L. 105-314, Title I, § 103, 112 Stat. 2976; Nov. 2, 2002, Pub.L. 107-273, Div. B, Title IV, § 4002(c)(1), 116 Stat. 1808; Apr. 30, 2003, Pub.L. 108-21, Title I, §§ 103(a)(2)(C), (b)(2)(B), 105, 117 Stat. 652, 653, 654.)

18 U.S.C.A. § 2423, 18 USCA § 2423
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.  2

Addendum 4a